HEARD NOVEMBER TERM, 1873.

DUDLEY *vs.* ODOM.

A contract between two creditors interested in a public sale about to be made by an
assignee in bankruptcy, that one will not bid against the other, and, in considera-
tion thereof, that the latter will pay to the former a certain sum of money, is against
public policy, and, therefore, null and void.

BEFORE TOWNSEND, J., AT BENNETTSVILLE, SEPTEMBER
TERM, 1873.

This was an action by C. W. Dudley against Noah Odom to
recover $700 alleged to be due on contract.

The case was this: The plaintiff held a judgment by confession
for $2,112.98, entered 22d August, 1866, against John Odom, the
father of defendant; and J. H. Hudson also held an older judg-
ment against John Odom, which amounted, at the time of the sale
herein mentioned, to about $1,500. In 1868, John Odom was ad-
judged a bankrupt on his own petition, and on November 1st of the
same year his real estate, consisting of 600 acres of land, of the
value of $10 per acre, was sold by his assignee, and purchased by
the defendant at the price of $1,500. The plaintiff and defendant
met at the time and place of the sale, and just before the property
was offered by the assignee it was agreed between them that the
defendant should bid $1,500, a sum sufficient to satisfy Hudson's
judgment; that the plaintiff should not bid, and in consideration

thereof, that defendant would pay to the plaintiff $700 whenever the Supreme Court of the United States should decide that obligations for the purchase money of slaves were valid debts, that being the character of the debt on which plaintiff's judgment was founded. The plaintiff did not bid at the sale, and the Supreme Court of the United States having decided that obligations for the purchase money of slaves were valid debts, this action was commenced to recover the $700 and interest.

The contract, as alleged in the complaint, was as follows:

"That the defendant, Noah Odom, knowing that a sufficient amount of money would be realized from the sale of his said father's real estate to satisfy the plaintiff's said confession of judgment, and, fearing competition in the bidding when the said land should be offered for sale, applied to and induced the plaintiff to desist from bidding for the same, agreeing to and with the plaintiff, and promising that he, the said defendant, would pay the plaintiff the sum of seven hundred dollars, whenever the Supreme Court of the United States should decide that obligations given for the purchase money of slaves were valid debts, if he, the said defendant, should be allowed to bid off the real estate of the said John Odom, without opposition from the plaintiff.

"That, in consideration of said agreement, and confiding in the promises and undertakings of the said defendant, supposing that he intended fairly and faithfully to carry out his promises made as aforesaid, he (the plaintiff) made no bid for the said land, which was sold at Bennettsville, S. C., on the first day of November, A. D..1868, and was bought by the defendant for a nominal price, the sum of fifteen hundred dollars, much less than the real value."

The defendant's counsel contended that the contract as alleged and proved contravenes established principles of public policy, and is, therefore, null and void, and cannot be enforced in a Court of justice. His Honor declined so to rule, and instructed the jury that the contract was legal and binding.

The jury found for the plaintiff, and after judgment entered the defendant appealed.

*Hudson,* for appellant:

The plaintiff's cause of action is an agreement or contract which contravenes established principles of public policy; is, therefore, illegal and void, and ought not to be sanctioned in a Court of jus-

tice. "The forbearance of bidding was the real (and only) consideration, and it is a consideration which ought not to be sanctioned in a Court of justice."—*Jones* vs. *Casswell*, 3 Johns. Cas., 30. "The abstaining from bidding, upon concert or agreement, under a promise of benefit for thus abstaining, is the very evil the law intends to repress. * * * * * The principle (*i. e.*, that sales must be free from combinations to silence bidders) is of too salutary a nature to permit any refinements which go to sap or subvert it."— *Thompson* vs. *Davies*, 13 John. R., 114. "An agreement not to bid, for the purpose of paralyzing competition, vitiates the sale so that no party to such agreement can claim any benefit from it. The sale is void at law. There is no part of the transaction which should be preserved."—*Smith* vs. *Greenlee*, 2 Dev., 128.

The principle, that sales at auction, and particularly on legal process, should be conducted with good faith and without prejudice to any party, is so well founded in public policy that, while Courts of law will withhold aid from either party to an agreement to abstain from bidding, and leave them without legal remedy, Courts of Equity will go further, and declare void a sale at which bidding has been chilled.— *Troup* vs. *Wood*, 4 Johns. Ch., 228–254; *Martin & Walter*, vs. *Evans*, 2 Rich. Eq., 368; *Hamilton* vs. *Hamilton*, 2 Rich. Eq., 379.

Chancellor Dunkin, who delivered the opinion of the Court in both the aforesaid cases, in Rich. Eq., discusses with much force and clearness the doctrine of auction sales under decree of Court, and cites, with approval, the above named cases from New York and North Carolina. In closing his review of all the cases bearing on the subject, he says, in *Hamilton* vs. *Hamilton*: "The current of decisions is so uniform, and the general principles so clearly announced, that it is not deemed necessary further to consider its validity, or the importance of preserving it." "Agreements whereby parties engage not to bid against each other at public auctions, especially in cases where such auctions are directed or required by law, as in cases of sales of property under execution, are held void; for they are unconscientious and against public policy, and have a tendency injuriously to affect the character and value of sales at public auction, and mislead private confidence."—Story's Eq. Jur., 293.

The contract is void by the common law, and the reason why the common law says such contracts are void is for the public good.

You shall not stipulate for iniquity. No polluted hand shall touch the pure fountain of justice. And for the public good the law allows either party to such a contract to take advantage of its illegality, and impeach it in a Court of justice.—Chit. on Con., 571. Lord Mansfield says : "The principle of public policy is this, *ex dolo malo non oritur actio.* No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If from the plaintiff's own stating or otherwise, the cause of action appear to arise *ex turpi causa,* or a transgression of a positive law of this country, there the Court says he has no right to be assisted."— *Holman* vs. *Johnson,* Cowp., 343.

*McIver,* contra :

A doubtful matter of public policy is not sufficient to invalidate a contract. An agreement is not void on this ground, unless it *expressly* and *unquestionably* contravene public policy and be *manifestly* injurious to the interests of the State.—Chit. on Con., 664, 6th Am. Edit.; see, also, remarks of Best, C. J., in *Davis* vs. *Bank of England,* 9 E. C. L. R., 452, and in *Richardson* vs. *Mellish,* 9 E. C. L. R., 397.

Unless the contract in question can be shown to be in violation of some statute, or in contravention of some established principle of the common law, it is not subject to the objection raised against it.

It is not pretended that we have any statute on the subject, nor do we find it in any of the classes which are mentioned in the elementary writers on contracts, as instances of contracts in violation of public policy; for instance, contracts in restraint of trade, in restraint of marriage, marriage brocage contracts, sale of offices, contracts affecting the course of public justice, etc.—Chit. on Con., 664, 678.

Illegality of a contract cannot be inferred ; the burden is on the party making the objection to establish it clearly.—Chit. on Con., 659.

The English cases furnish no authority for the proposition contended for by appellant. See admission of Dunkin, Ch., in *Martin and Walter* vs. *Evans,* 2 Rich. Eq., 370.

The appellant's proposition rests upon the authority of the following New York cases : *Jones* vs. *Caswell,* 3 Johns. Cas., 30, *Thompson* vs. *Davies,* 13 Johns., 114, which will be commented on for the purpose of showing that they do not sustain the proposition

of appellant in its fullest extent, and at most only establish the rule, that where the proof shows an agreement not to bid at an auction sale, such proof is only *prima facie* evidence of fraud, and, *unless explained*, will vitiate the agreement.

If this be the correct rule, then appellant has no ground upon which to claim the interposition of this Court, as he failed to ask the Circuit Judge so to lay down the rule to the jury.—*Abrahams* vs. *Kelley and Barrett*, 1 S. C., 235.

In *Hamilton* vs. *Hamilton*, 2 Rich. Eq., 388–9, Harper, Ch., says that the above cited New York cases have been followed, to a certain extent, in other States, but in no instance without qualifications and exceptions ; for instances of which he cites *Smith* vs. *Greenlee*, 2 Dev., 126 ; *Phippen* vs. *Stickney*, 3 Met., 384.

No case in our own State sustains the position contended for by appellant, what is said in *Martin and Walter* vs. *Evans*, and in *Hamilton* vs. *Hamilton*, by Dunkin, Ch., being mere *dicta*. On the contrary, in two cases, our Courts have sustained agreements which would seem to be more directly in contravention of public policy than the one now in question.—*Carson* vs. *Rambert*, 2 Bay, 560 ; *Owen* vs. *Davis*, 1 Bail., 315.

Respondent was under no obligation to bid. He attended the sale merely to protect his own interest, and was at liberty to do anything, not illegal, to effect that purpose. He did nothing to chill the biddings ; on the contrary, increased the bid of the purchaser, and required him to bid fifteen hundred dollars.

March 20, 1874. The opinion of the Court was delivered by

MOSES, C. J. The respondent held a second lien by judgment recovered in 1866 on the land of one John Odom, who, in 1868, was adjudged a bankrupt. His land having been advertised for sale by his assignee, on the day appointed therefor, Noah Odom (the appellant,) the son of said John, agreed with C. W. Dudley, (respondent,) that if he would desist from bidding on it, and allow him (the appellant,) to bid it off without opposition from the respondent, he would pay him the sum of seven hundred dollars whenever the Supreme Court of the United States should decide that obligations given for the purchase money of slaves were valid debts. The land, which was proved to be worth six thousand dollars at the time of sale, was bought by the appellant at fifteen hun-

dred dollars—the only bid made.   All knowledge of the agreement
was confined to the parties and a third person, who was called as a
witness to it.   It was not denied that the validity of contracts for
the purchase of slaves was sustained by the Supreme Court of the
United States in May, 1872.

The action was brought for the recovery of the amount alleged
to be due under the agreement.

On the part of the defense it was insisted "that the agreement
or contract sued upon and set up in the testimony for the plaintiff,
is one that contravenes established principles of public policy, was,
hence, illegal and void, and cannot be enforced in a Court of justice."
The Circuit Court overruled the proposition of law thus submitted,
and a verdict was rendered for the sum demanded, with interest
thereon from the first day of May, 1872.   The question which we
have now to consider is, whether there was in this error of law on
the part of the Court?

It is not to be denied that contracts which are in violation of a
positive statute, or of long established and recognized principles of
public policy, cannot be enforced in Courts of justice.

The former speaks the will of the community through the Legis-
lative power, and demands a direct obedience, by the observance of
all the obligations which it imposes.   It is the expression of the
public, in the most authoritative mode that it can use, to assert its
opinion upon the subject-matter to which it relates.   It is not essen-
tial to its validity that it should attach any penal provision for its
violation.   It may prohibit certain acts, and declare that all agree-
ments made through their intervention shall be without force or
effect.   Upon analogous principles, and in the absence of all statu-
tory regulations, considerations of public policy, long established,
may operate to the full extent, as if enjoined by legislative enact-
ment, to prevent the enforcement of contracts which are in contra-
vention of them.

They, too, in another form, speak the public will, not through the
law-making power, but because the continued acquiescence of the
community gives to the judicial decisions which announce it the
force of law.   Precedent following precedent, without interference
on the part of the Legislature, at last ripens into a common law,
with all its consequences and sanction.

It is scarcely necessary to enquire whether the sale made here
was an official one, for the rules which govern and regulate bidding

at such sales apply to all public actions. It is true that they are more carefully watched and jealously regarded where the sale is under judicial process. We must hold the sale here to have been one made by the order of a competent Court, for without it the assignee in bankruptcy could not lawfully sell the effects of the bankrupt.

Does an agreement at such a sale between two or more not to bid against each other contravene established principles of public policy?

It was the sale of the land of a bankrupt. The purpose was to obtain the largest possible price for the creditors by the competition through unrestrained bidding. Whatever was calculated to prevent the result which might thus be realized prejudiced the object which the Court proposed by its order. Justice, not only to the owner of the property, but a sense of respect to the Court, which, in fact, is the seller, require that when it orders a sale to the highest bidder no combination shall be made which may prevent a full and open competition among those who may be disposed to buy. Official sales without these safeguards would not reach the end contemplated by the orders which direct them. It is needless, however, to enlarge upon the views which look to the policy of the rule that demands a free and open field for all who propose to bid at such sales, for they are now comprehended in a principle which obtains not only in the Court of Equity, but that of law, and no where carried to a greater extent than by the decisions in our own State.

In *Jones* vs. *Creswell*, 3 John. Cas., 29, the action was on a note given for forbearance to bid at a sale by the Sheriff, and it was held "a consideration which ought not to be sanctioned in a Court of justice." The Judge delivering the opinion of the Court says: "A combination to prevent fair competition is contrary to morality and sound policy. It operates as a fraud upon the debtor and his remaining creditors by depriving the former of the opportunity which he ought to possess of obtaining a full equivalent for the property which is devoted to the payment of his debts, and opens the door for oppressive speculaticn." The same principle had been announced in *Doolin* vs. *Ward*, 6 John., 194; in *Wilbur* vs. *How*, 8 John., 444; and in *Thompson* vs. *Davies*, 13 John., 112. Chancellor Kent, in *Troup* vs. *Ward*, 4 J. C. R., 254, re-affirms the doctrine laid down in *Jones* vs. *Creswell*, by a Court of which he was then a member.

In this State the point was fully and at large considered by the Court of Errors, in *Hamilton* vs. *Hamilton*, and *Martin and Walter* vs. *Evans*, 2 Rich. Eq., 355, 368, in which it was held "that the principle which governs all sales at auction, and especially judicial sales, is that there should be full and fair competition. Any agreement or combination, therefore, the object and effect of which are to chill the sale and stifle competition, is illegal, and no party to the agreement or combination can derive benefit from the sale."

Ch. Duncan, closing the opinion of the Court, says, "the current of decisions is so uniform, and the general principle so clearly announced, that it is not deemed necessary further to consider its validity, or the importance of preserving it."

Ch. Harper who delivered the dissenting opinion of the Court, p. 389, says "that the matter seems to have been put upon the proper footing in Massachusetts, in *Phippen* vs. *Stickney*, 3 Met., 384." There the rule, as laid down in the cases then before him, appears to have been narrowed, by requiring it to depend upon circumstances, showing an innocent intention, or a design to prevent competition and depress the price. Let the principle declared in *Phippen* vs. *Stickney* be tested by the circumstances of the case now under review. The purpose of the sale was to obtain the highest price which might be offered. The agreement of the parties prevented this, for while the appellant obtained the land at his bid of fifteen hundred dollars, the agreement sued upon required that he should pay the additional sum of seven hundred dollars, not for the benefit of the seller, but for that of. the respondent. Was the consideration which induced the agreement on the part of the appellant anything but the forberance of the respondent? In fact, his complaint avers "that the defendant, Noah Odom, knowing that a sufficient amount of money would be realized from the sale of his said father's real estate to satisfy the plaintiff's said confession of judgment, and fearing competition in the bidding when the said land should be offered for sale, applied to and induced the plaintiff to desist from bidding on the same, agreeing to and with the plaintiff, and promising, that he, the said defendant, would pay the plaintiff the said sum of $700, &c.; that, in consideration of said agreement, and confiding in the promise and undertaking of the said defendant, supposing that he intended fairly and faithfully to carry out his promises made as aforesaid, he (the plaintiff) made no bid for the said land, which was sold at Bennettsville, on the 1st Novem-

ber, 1868, and was bought by the defendant at a nominal price, the sum of $1,500, much less than the real value."

Does not this allegation amount to a clear admission by the respondent of a combination or confederation for the purpose of preventing competition, and depressing the price of the property below its fair market value? Who but the plaintiff (below) had an interest in the bidding, after the bid which was stipulated to be made under the agreement? It was, by the understanding of the parties, to satisfy the senior judgment, and the creditor next in interest was the respondent himself, who preferred the seven hundred dollars rather than risk the purchase of the land at a price beyond the fifteen hundred dollars, which last sum he would have been obliged to advance if the land had been knocked off to him; for that amount was obliged to be paid before any of the purchase money could be applied to his judgment. It appears idle to pursue the facts further, to show that they bring the case even within the rule contended for by the dissenting members of the Court of Errors in *Hamilton* vs. *Hamilton*, and *Martin & Walter* vs. *Evans*.

We have no idea that the respondent intended to violate any moral rule, but his agreement cannot be sustained, because it is in disregard of law; nor have we anything to do with the want of faith on the part of the appellant.

An English Judge has properly said, " the law encourages no man to be unfaithful to his promise, but legal obligations are, from their nature, more circumscribed than moral duties."

The allegation that "the defendant, by his pleading, having put his defense upon a general denial of the contract sued on, cannot take advantage of any illegality in the contract," cannot prevail. No such exception was taken in the Circuit Court. On the contrary, the brief shows that the counsel for the appellant submitted to the Court his proposition of law, which impugned the validity of the agreement sued upon. "The plaintiff's counsel, in replying, first combatted the said legal proposition, and then addressing the jury upon the facts of the case rested." The exception not having been made in the Court below, it cannot be interposed here.

The view which the Court takes in regard to the principal question made in the cause renders unnecessary any consideration of the point submitted in regard to the interest allowed in the verdict.

The motion for a new trial is granted, and the case remanded to the Circuit Court.

*Wright*, A. J., and *Willard*, A. J., concurred.